CITY OF ST. JOSEPH v. GEORGE H. WYATT, UNITED STATES FIDELITY & GUARANTY COMPANY et al., Appellants.

In Banc, May 17, 1918.

**LIMITATIONS: Defaulting City Treasurer: Liability of Bondsmen: Concealment.** The surety on the bond of a city treasurer, who had appropriated the city's money more than three years before suit was brought, and whose books it was the duty of the comptroller and auditor, both by ordinance and statute, to examine, and whose cash on hand it was the duty of the comptroller to count and see that it corresponded with his own books as well as those of the auditor and of the treasurer, and which duties were not performed, but wholly neglected, although the comptroller's attention was by his deputy called to the great amount of cash which the treasurer's reports showed he had on hand as being suspicious and requiring counting, is not liable for the treasurer's defalcation. There was no such diligence to discover it as prevented the three-year Statute of Limitations (Sec. 1890, R. S. 1909) from running.

Appeal from Buchanan Circuit Court.—*Hon. Thomas B. Allen*, Judge.

REVERSED AND REMANDED (*with directions*).

*Culver & Phillip*, for appellant United States Fidelity & Guaranty Company.

The court erred in holding that the three-year Statute of Limitations did not apply in this case and in

refusing defendant's instruction which so declared. Secs. 1890, 8582-4, R. S. 1909; Shelby County v. Bragg, 135 Mo. 291; Adams v. Gossom, 228 Mo. 566; State ex rel. v. Yates, 231 Mo. 276; Johnson v. United Railways, 243 Mo. 278; Putnam County v. Johnson, 259 Mo. 73; State ex rel. v. Harter, 188 Mo. 516; State ex rel. v. Stonestreet, 92 Mo. App. 214.

*McCabe Moore* and *William E. Stringfellow* for appellant American Fidelity Co.

*Charles L. Faust* and *Perry A. Brubaker* for respondent.

The three year Statute of Limitations does not apply in this case because the facts pleaded and proven clearly bring it within the exception. The authorities are unanimous, that the Statute of Limitation does not begin to run where fraud and deception have prevented discovery. State ex rel. v. Gates, 231 Mo. 276; Putnam County v. Johnson, 259 Mo. 73; Johnson v. United Railways, 243 Mo. 278; Shelby County v. Bragg, 135 Mo. 291; State ex rel. v. Hawkins, 103 Mo. App. 254. Even the negligence of other officers in failing to discover shortage is no defense. State v. Atherton, 50 Mo. 210; Town of Hudson v. Miles, 71 N. E. 63. Laches is no defense when fraud is not discovered. The duty to commence proceeding arises only upon discovery. 2 Pomeroy Equity Jurisprudence, sec. 917, p. 1648. Sureties cannot claim laches. State v. Powell, 8 Am. St. 522.

RAILEY, C.—On September 2, 1914, plaintiff, a city of the first class, sued George H. Wyatt, the United States Fidelity & Guaranty Company and the American Fidelity Company, to recover of Wyatt, as treasurer of the city of St. Joseph, and said companies as sureties on his official bonds, an alleged shortage of $30,341.51. The case was disposed of by the trial court as a proceeding in equity. Hon. L. A. Vories was appointed

master in chancery to hear the evidence, and report his findings of fact and conclusions of law. After hearing the testimony the master made his report to the court, which was confirmed by the latter, and judgment entered for the penalty of the various bonds given by Wyatt, as city treasurer, to be satisfied on payment by the defendant, the United States Fidelity & Guaranty Company, of sums aggregating $21,942.46, and by the American Fidelity Company of the sum of $4429.09.

It appears from the record that Wyatt was elected and served as treasurer of said city for four years from April 16, 1906, during which period the United States Fidelity & Guaranty Company was surety on his bond, as treasurer aforesaid, in the penal sum of $50,000. It appears that Wyatt was again elected treasurer of said city for a period of two years from April 15, 1910.

The master found—and the evidence shows—that:

"The amount of money misappropriated by Wyatt during a period extending from April 16, 1906, to September 2, 1911, was $16,431.69, which represents the sum for which the United States Fidelity & Guaranty Company disclaims liability because of the running of the three-year Statute of Limitations, this suit having been brought and filed September 2, 1914."

Both of the surety companies aforesaid filed their respective motions for a new trial and motions in arrest of judgment. All of said motions were overruled and both of said defendants appealed to this court. The American Fidelity Company dismissed its appeal in this court. On the record before us, it becomes our duty to determine whether the remaining surety company is liable for the shortage of $16,431.69 aforesaid, or whether said demand is barred by virtue of the provisions of Section 1890, Revised Statutes 1909.

Such other matters appearing of record, as may be necessary, will be considered in the opinion.

I. This action was brought against Wyatt, as treasurer of plaintiff, and the two corporations as his

sureties. The American Fidelity Company dismissed its appeal in this court. The evidence shows, and it is conceded by the United States Fidelity & Guaranty Company, that from September 2, 1911, to April 15, 1912, while said last named company was surety for Wyatt, the latter misappropriated $1719.49 of funds belonging to plaintiff. The evidence also shows, and it is conceded by the United States Fidelity & Guaranty Company, that from April 21, 1913, to February 12, 1914, when Wyatt resigned, he misappropriated $3742.28 of funds belonging to plaintiff; that the total amount misappropriated by Wyatt, after September 2, 1911, while the above named Guaranty Company was his surety, amounted to $5461.77.

*Admissions.*

On page 26 of said company's brief, it is said: "This defendant admits its liability for this amount and made the same admission before the master, and the trial court." On page 9, of the Guaranty Company's brief, it is said: "This defendant made no claim below, nor does it here, that it is not liable for all moneys embezzled during that part of the three years preceding the bringing of the suit when it was surety on Wyatt's bond. It did insist below, and does here, that it is not liable for shortage occurring before that period, because barred by the three-year Statute of Limitations."

The evidence shows, and the master found, that Wyatt, as treasurer, between April 15, 1906, and September 2, 1911, while the United States Fidelity & Guaranty Company was its surety, misappropriated $16,431.69. If the above demand is found to be barred by Section 1890, Revised Statutes 1909, it would necessitate a reversal and remanding of the cause.

In view of the foregoing and the elimination of the American Fidelity Company, as appellant herein, we do not deem it necessary to consider, or determine, whether the petition states a good cause of action in equity, nor whether there was an improper joinder of parties defendant, or of different causes of action therein.

II. It is contended by the United States Fidelity & Guaranty Company that plaintiff's demand as to said

Concealment. shortage of $16,431.69, which occured more than three years prior to the commencement of this action, is barred by the provisions of Section 1890, Revised Statutes 1909, which reads as follows:

"Within three years: First, an action against a sheriff, coroner or other officer upon a liability incurred by the doing of an act in his official capacity and in virtue of his office, or by the omission of an official duty, including the non-payment of money collected upon an execution or otherwise; second, an action upon a statute for a penalty or forfeiture, where the action is given to the party aggrieved, or to such party and the State."

We are clearly of the opinion that the liability of the Guaranty Company for the payment of said sum of $16,431.69 must be determined under the above section, in connection with the facts of the case. The burden of proof devolved upon plaintiff to show a state of facts which prevented said statute from running against it. The *quantum* of proof necessary under such circumstances is fully discussed in Shelby Co. v. Bragg, 135 Mo. l. c. 298, and following; Callan v. Callan, 175 Mo. l. c 360-1-2; State ex rel. v. Harter, 188 Mo. 516; State ex. rel. v. Yates, 231 Mo. 276; Johnson v. United Railways, 243 Mo. l. c. 298, and following; Putnam County v. Johnson, 259 Mo. 73.

The master, in his report, correctly said:

"In this case our charter provides for a system of triplicate receipts, under which the city comptroller and auditor each have a complete record in their offices of all moneys received by the city treasurer, and as all warrants for the disbursement of money must be drawn by the auditor and countersigned by the comptroller, each office must have a complete record of all disbursements made by the treasurer. The treasurer makes a daily and monthly report to the comptroller of all receipts and expenditures, together with money

on hand, and where. The comptroller thus has a daily and monthly check upon the treasurer, and it is his duty to examine these reports and compare them with his own books, and if any discrepancy is found to have the same corrected, which the comptroller constantly did.''

The further statement of the master in his report, is sustained by the testimony:

''An actual count of the money in the office of the city treasurer at any time during Wyatt's incumbency of this office would have disclosed a discrepancy between the vault balance, as shown by the cash-journal and the reports made by the city treasurer to the comptroller, and the cash balance actually in the office, which discrepancy would be the true shortage. An examination was not made of the treasurer's cash or vault balance by the comptroller or anyone for the city, though at one time, in the latter part of October, 1912, a deputy comptroller, then recently appointed, suggested that it should be done. The comptroller did not make the examination, as he had been advised that he had no authority to do it. . . .

''During Wyatt's various terms of office, the city comptroller, in addition to the duties imposed upon him by the general laws of the State of Missouri, was required by ordinance to exercise a general supervision over all the offices of the city regarding the proper management of the fiscal concerns of their respective offices; to, examine the books of each department from time to time and see that they were kept in proper form; to see that all necessary reports were made to him from the various officers of the city; that officers receiving money paid the same to the city treasurer when required, and report all delinquents to the mayor; to direct the city counselor to take immediate legal measures for the recovery of any default or shortage when any officer of the city should become a defaulter; to make a semi-annual report to the common council as to the financial condition of the city, giving a full

detailed account of all receipts and expenditures, and of all liabilities of the city, the amount of money on hand belonging to each of the different funds or departments, the balance of the money in the city treasury, and the sum due and outstanding, the names of all persons who might be defaulters to the city, and the amounts in their hands unaccounted for.''

Shaffer—the former comptroller—testified that none of the reports which Wyatt made to him, were ever *signed* by the latter.

In respect to cities of the first class, Section 8384, Revised Statutes 1909, reads as follows:

''The comptroller shall have the city comptroller of the collection and return into the treasury and disbursement of all revenue and moneys of the city, of the proceedings therefor and of all property and claims. He shall see that all proper legal proceedings are had to recover, keep and manage such property or other interests; that all proper rules and regulations are prescribed and observed in relation to all accounts, settlements and reports regarding the fiscal concerns of the city; that no appropriation or funds are overdrawn or misapplied, and that no liability is incurred nor money or property of the city disbursed or disposed of contrary to the spirit of the law or ordinance.''

Ralph Van Houten, deputy city comptroller, introduced as a witness by plaintiff, testified, *that he could have taken the books of the city treasurer, and by counting his cash in the vault, have ascertained how he stood with the city.* He testified, in regard to this matter, as follows:

''Q. In other words, the only thing lacking in your office as deputy comptroller to enable you to tell those conditions was seeing those cash items? A. Yes, sir, verifying the vault balance. . .

''Q. Now, did that excite your supicion? A. Well, it did as soon as I had been down here long enough to get familiar with the books.

''Q. What, if anything, did you do about that? A. Well, I talked it over—I called Mr. Shaffer's at-

tention to it, and also talked it over with others down there.

"Q. Well, with whom else connected with the city? A. Well, with the deputy city auditor, and with the man who is now city treasurer—Frank Allen.

"Q. In other words, it was your opinion that that was too large a balance to carry in the vault, and in the second place that it ought to be verified? A. No, I didn't think there was any shortage; my suspicions were that he was using that money for his personal business, and would put it back at any time; that he was perfectly responsible for it.

"Q. What was it that aroused your suspicion? A. Well, I knew that it was not necessary to carry that much money in the vault; and another thing, that vault is not built to carry twenty thousand dollars; and there would be no necessity for carrying over three thousand, anyway.

"Q. In other words, from the surroundings there and facts as you understood them, you didn't believe that he had that much money in the vault? A. No."

*It is clear from the testimony, that from the time Wyatt commenced as treasurer in 1906 up to the time he resigned in 1914 the comptroller of said city could have ascertained, by counting the cash in the vault, the shortage of Wyatt at any time. He made no effort to obtain any information upon this subject, notwithstanding the suspicious circumstances detailed to him by his own deputy.* The manifest purpose of the law in requiring the city treasurer to file with the auditor and comptroller the monthly statements heretofore mentioned, was to furnish them the means of checking up his accounts and ascertaining whether he had on hands the assets necessary to correspond with said statements and the treasurer's books. What was the necessity for the comptroller and auditor to keep a record in regard to the proceedings of the treasurer, unless they were expected to check up his cash balance and determine its correctness? Would the report of a bank examiner stating that he had examined the books of a bank and

found them correct, be of any service to the State, in determining the solvency of the bank and the integrity of the institution, *if he had admitted in his report that he had failed to count the money and assets of the bank?* The comptroller, even when put upon inquiry by the suggestions of his deputy, that the treasurer was using the city's funds for his own use, made no effort to ascertain the facts, or to take any action in respect to the matter.

This court, in the opinions heretofore cited, has defined what is necessary for the city to show, in a case of this character, to avoid the three-year Statute of Limitations.

In Shelby County v. Bragg, 135 Mo. l. c. 298, speaking through Judge MACFARLANE, we said:

"It cannot be said that the evidence of the facts constituting plaintiff's cause of action was concealed or suppressed. The evidence all existed upon the official books and records of the office open to the examination of the court. The expert accountants who afterward made an examination encountered no difficulties in making an account of fees collected. They reported no destruction of books, or the suppression or concealment of no fact which could prevent an accurate statement being made.

"It is insisted that the duty of this officer and his relation to the county court was such that the latter had the right to rely implicitly on the correctness of these statements and that making a statement which did not fully and truthfully account for all fees collected is such a fraudulent concealment of the facts as would delay the running of the statute. But the county court is required to examine the statements and see that they are correct before approving them; it was not intended that they should accept as true any statement the officer should make. The evidence by which the truth could have been ascertained was at hand and open to their examination. Indeed, the statements did not all purport to be accurate; they do not pretend to give an itemized account of the fees collected and from

whom; they virtually refer the court to the records of the offices for the evidence.

"The county court is given the power to audit the accounts of these officers and it is made their duty to examine statements made by them and, if necessary, to hear the evidence of witnesses. A mere examination of the statements is not a proper performance of their duty. They should see that the statements are correct. This is particularily so when the statements on their face, as in this case, are not such as the law requires. It cannot be said that the county court was ignorant of facts which were open to its examination, and which it was its duty to know.

"Statutes of Limitations are favored in the law and cannot be avoided unless the party seeking to do so brings himself strictly within some exception. 'A party seeking to avoid the bar of the statute on account of fraud must aver and show that he used due diligence to detect it, and if he had the means of discovery in his power, he will be held to have known it.' [Wood v. Carpenter, 101 U. S. 141; Buckner v. Calcote, 28 Miss. 432; Nudd v. Hamblin, 8 Allen, 130.] A party cannot avail himself of this exception to the statute where the means of discovering the truth were within his power and not used. [Cole v. McGlathry, 9 Me. 131.]"

In State ex rel. v. Yates, 231 Mo. l. c. 286 and following, Judge LAMM, in behalf of this Division, said:

"Attending to the testimony, we shall not cumber the opinion with it. It tends to show that Thomas from month to month reported his pretended receipts and disbursements to the board of managers, transcribing the account from his own books as treasurer and presenting receipts from the State Treasurer showing he had deposited with that official such moneys as his own report and the books showed he had received. The board of managers accepted his report as true and, finding the receipts of the State Treasurer to agree with the amounts reported by Thomas, looked no further and allowed Thomas's peculations to continue system-

atically during 1897 and 1898. Their excuse for this was that they had implicit confidence in his integrity and took no steps to check up his accounts to see if he had charged himself with all funds coming into his hands. At that very time facts and documents (duplicate receipts) showing systematic and heavy stealing were spread on the very books of the hospital and were in its files, subject to their command for inspection and use. Their bookkeeper kept a set of books as did the treasurer. This bookkeeper was secretary of the board and attended its meetings. It was the duty of the superintendent of the hospital to be present at the meetings of the board of managers and to make reports to the board. The books kept by the bookkeeper show that Thomas had received from time to time many thousands of dollars he was, in some instances, not accounting for, and, in others, was accounting for long after their receipt. The superintendent, under the evidence, as well as the bookkeeper and *ex-officio* secretary of the board, had handled most of the warrants, checks and drafts evidencing the moneys stolen, and, as said, these amounts appeared on the books of the bookkeeper, and yet neither the bookkeeper nor the superintendent was asked to investigate the state of Thomas's accounts as spread on the bookkeeper's books, nor did the board investigate the bookkeeper's books and compare them with Thomas's to see if they tallied. . . .

"The statutory scheme for the management of the hospital shows in its entirey that its board act, *inter alia*, as auditors, and diligence in that behalf is but a main part and parcel of the very body of their duties. If such board is to complacently assume that its treasurer is competent and honest, and is to assume, without looking or inquiring elsewhere than in his own books, that his accounts are true, then the board is a mere ornamental appendage with perfunctory duties, and its supervision and management are idle formulas, pertaining to the surface (and missing the heart) of the matter. Nothing is so productive of integrity and

care as the knowledge on the part of an officer that his official acts in handling public funds pass under the vigilant, scrutinizing and impartial eye of an efficient and intelligent board of management. To the contrary, nothing is so conducive to slovenliness, inefficiency and dishonesty as that a board of managers, with eyes blinded with conventional confidence in its officers, assume as true the very thing they were appointed to seek out and determine, viz., that their treasurer's books tell the whole truth about the receipts of public moneys. Those who sign bonds, as sureties for treasurers, sign them in the assurance that superintendents and boards of managers will perform the duties cast upon them by the law.''

The other authorities cited announce the same principles.

Without considering the subject further, we are of the opinion that the comptroller of plaintiff, from April 15, 1906, to September 2, 1911, failed to exercise *any diligence whatever* in ascertaining the true condition of Wyatt's financial shortage, when it could have been discovered by simply counting the money and assets in his vault. We hold, that the right of plaintiff to recover the $16,431.69, heretofore mentioned, is barred by Section 1890, Revised Statutes 1909.

The judgment below, as against the defendant, the United States Fidelity & Guaranty Company, is hereby reversed and remanded with directions to the trial court to set the same aside, as to the above named defendant, and to enter a judgment in favor of plaintiff and against said defendant, for the sum of $5461.77, with interest thereon from September 2, 1914, at the rate of six per cent per annum. *Brown, C.*, not sitting.

PER CURIAM:—The foregoing opinion of RAILEY, C., is adopted as the opinion of Court in Banc. *Graves, C. J.*, and *Walker, Blair* and *Williams, JJ.*, concur; *Bond* and *Faris, JJ.*, dissent; *Woodson, J.*, not sitting.